OLIVER S. BELDEN

*v.*

ANNIE W. BELDEN.

A wife, with her child, left her husband, in 1873, owing to his utter inability to maintain them, and after he had pledged a mortgage belonging to her, and constituting nearly all of her separate property, to secure his own debt, and pawned her jewelry and silver plate.  Soon after she left, she, by the advice of her relations, declined to return to him until she could be satisfied of his ability to support her.  He apparently acquiesced in her living separate from him till 1878.  In 1879 she absolutely refused to return to him.—*Held,* that her conduct, prior to 1879, if desertion at all, was not obstinate, within the meaning of the statute.

---

Petition for divorce.  On final hearing on pleadings and proofs.

*Mr. John T. Woodhull* and *Mr. F. C. Lowthorp,* for petitioner.

*Mr. P. L. Voorhees,* for defendant.

THE CHANCELLOR.

This suit is brought for a divorce from the bond of marriage, on the ground of desertion.  The parties, who both then resided here, were married in Philadelphia, December 16th, 1868.  They immediately thereafter went to Salem, in this state, to reside, and lived there together until March 25th, 1873, when the defendant, with her infant child, left that place, with her husband's consent, and went to Kingston, where she has ever since resided. The petitioner, Dr. Belden, alleges that his wife deserted him in April, 1873.  The petition was filed January 5th, 1880.  She, in her answer, denies the desertion, and says that she was constrained to leave him, by his cruel treatment of her.  The facts

appear to be, that they lived together in Salem until March, 1873, when, in consequence of the petitioner's pecuniary embarrassments, she went to Kingston, with his consent, to stay for a short time, and, apparently, until he could make new arrangements for the support of his family. She expected to return to him, but he did not provide the means for her to do so. Some correspondence passed between them soon after she left. It appears to have ceased in May, 1873. About the middle of that month she sent her brothers, Henry L. R. Van Dyck and Dr. Van Dyck, and Captain Garwood, to Salem, for her furniture, and it was delivered up to them by the defendant. He had sold her carpet, however, before they came. Soon after this time there were one or two interviews between the petitioner and the defendant, in one of which, at the house of her brother, Dr. Van Dyck, in Philadelphia (in the summer of 1873), he requested her to return to him, and she replied that she had decided not to do so until he knew how he was going to take care of her. The next time he saw her was at Princeton Junction, in the summer of 1874, and she says he then tried, unsuccessfully, to borrow $100 of her; but he denies it. She swears that he did not then ask her to return to him, and he does not say that he did. No communication of any kind passed between them, after that time, until the summer of 1878, when he wrote to her, soliciting her to return. He had an interview with her in the summer of 1879, and she then virtually refused to return to him. She gave him the impression, he says, that she would return when she could see her way clear to do so. In that same summer, in an interview with her brother, H. L. R. Van Dyck, she declared, in substance, that she could not return to her husband. When she left the petitioner, in March, 1873, it was, as before stated, because of his financial troubles. He was then in a great strait, pecuniarily, beyond all question. He had pawned her watch and chain, and the jewelry which he had given her; also her wedding gifts of silver, and most of her other silver plate. She had, when she was married, a separate estate, in money or securities, to the amount of above $6,000. Of that estate he had induced her to assign a bond and mortgage for $4,300 as collateral secu-

rity for a debt of his, and she had given into his hands, at his request, all the rest of her property, except that bond and mortgage, and he had spent it. Her brother, Dr. Van Dyck, redeemed her watch and jewelry, and part of the silver, for her, and obtained an assignment to himself in her behalf of the bond and mortgage, by paying the debt (it amounted to about $800), as security for which they were assigned. The petitioner refused to consent to the assignment to Dr. Van Dyck, unless he was absolutely discharged from all liability to his wife for the debt. The defendant alleges that she suffered for the want of the necessaries of life towards the latter part of her stay in Salem, and that appears to be the cruelty charged in her answer. If she did, it was undoubtedly due to the petitioner's poverty. That he was poor, then and subsequently, there seems to be no room to doubt. It is unnecessary to refer to the evidence on that subject. That it was difficult for him to get a living for himself and family seems to be equally clear. His poverty, however, was not a ground for the abandonment of him by the defendant, and it appears that she never entertained the intention to remain away from him until her brother, Dr. Van Dyck, moved by his interest in her welfare, and in view of the petitioner's embarrassments and poverty, advised her not to return to him until she had evidence that she would be properly maintained. Dr. Van Dyck testifies that after she left Salem he found her looking very ill, and that she appeared to be in great trouble ; that he discovered, on a visit to Kingston, that the petitioner had been there, and seemed to be in a great deal of trouble also, and had borrowed money of his (Dr. Van Dyck's) brother ; that he (Dr. Van Dyck) insisted on the defendant's giving him a statement of her affairs and condition at home, which she did ; that she told him her property was in pawn, and her furniture held for debt, and that she had no money with which to pay the expenses of her return to Salem, and he says he then told her she must remain away from Salem until her friends had evidence that she would be cared for. When, in the summer of 1873, the petitioner asked her to return to him, and she replied that she had decided not to do so, until he knew

how he was going to take care of her, she undoubtedly acted on the advice just mentioned. From that time the petitioner had no communication with her, except in the interview at Princeton Junction, until he wrote to her in September, 1878. In a letter dated on the second of that month, after speaking on the subject of his proposed removal of the remains of their deceased child from the Salem burying-ground to the cemetery at Princeton, he says : "Another object in writing to you is to ascertain if you would be willing to accept or make any reasonable proposition by which the unnatural *status* of our relations could in any respect be relieved. I deem it my duty, as a professing Christian, to make a special effort to relieve it, if possible." He concludes the letter with a prayer that she may be guided to receive the communication in the right spirit. From the summer of 1873 to the fall of 1878, he does not appear to have solicited her to return to him. Her furniture was under levy for his debt in 1875, and at his request she went to Salem to release it, but she left again on the same day. She says that he did not then invite her to stay, and though he says his "recollection is" that he did, he does not say so positively, and, indeed, he does not, in his testimony, reckon that among the occasions on which he asked her to return to him. Nor did he contribute to her support, or that of her child, during that period of more than five years. She has but little property, and is, and before her marriage was, disabled to a great extent, by permanent stiffness of her left arm (the result of disease), from doing any work to obtain the means of livelihood, except light sewing. She has lived, since her separation from her husband, in a part of her late father's homestead, which part was secured to her by his will, in view of her crippled condition, for a refuge, in case of necessity. Up to 1879 she never refused to return to the petitioner, but was apparently willing to do so, if it appeared he could support her. In that year she appears to have refused to return. He then offered, if she would return, to place $500 in the hands of his lawyer, as security that he would support her, and to agree to pay over to the lawyer $100 a month thereafter, for the support of the fam-

ily, and house-rent; the money to be drawn by her in sums not to exceed $25 a week. She, nevertheless, declined to return, and gives as her reason that she did not know that the petitioner could carry out his proposition. It is needless to say that a wife cannot deal thus with her husband and not render herself liable to the charge of deserting him. But the conduct of the petitioner, from the time when the defendant left him up to the letter of September 2d, 1878, was such as to lead to the conclusion that he acquiesced in the separation during that time. It is true he says he asked her to return in the summer of 1874, but she denies it, and I see no reason to give greater credit to him than to her on this point. Neither of them is corroborated. A divorce will not be granted on the testimony of the applicant alone. He does not appear to have sought to induce her to return to him from the summer of 1873 to the fall of 1878, but, on the other hand, left her to struggle along, and with great difficulty, for the support of herself and her child, without aid of any kind, or even any communication from him. He did not discharge his duty towards her in the premises. If her separation from him could be regarded as willful desertion from the time when, in 1873, she is proved to have declined to return, it is clear that during the period that intervened up to September, 1878, he did not, in the language of the court in *Cornish* v. *Cornish, 8 C. E. Gr. 208,* make the advances or concessions which a just man ought to have made to put an end to the desertion. His financial embarrassment in the spring of 1873 was manifestly very great, and distressing to both him and her, and his conduct towards her in respect to her property was very aggravating, as well as mortifying. He appeared, indeed, to be unable to provide for her, and yet, after she left him, she was willing to return, and but for family advice, which was honestly and sincerely given, and intended for her benefit, would undoubtedly have done so. Nor had she any evidence whatever, even by his bare declaration, from the summer of 1873 to the fall of 1878, that he was in anywise able to contribute anything to her support, or that of their child. When she declined to return, in 1873, he obtained from her four out of five dollars she had borrowed for her own

use, to buy him a pair of shoes. Her letters to him—while in the latest ones she expresses distrust of his ability to support her —are not unaffectionate. Those written in 1873, judging from their language, are the letters of a loving and faithful wife. No intention to desert her husband appeared in her language or conduct up to 1879. And if she could be held to have deserted her husband in 1873, as I think she could not—for though there was cessation of cohabitation, there was no intention to desert— her desertion could not be said to have been obstinate.

The petition will be dismissed, with costs.